Case 15-2016 United States v. James Lowe Good morning, your honors. May it please the court. My name is Chris Farner from Chattanooga, Tennessee, and I'm here today on behalf of James Lowe, the appellant here and the defendant below. The issue today has to do with whether Mr. Lowe's criminal conviction was based upon substantial evidence upon which a reasonable jury could have concluded that Mr. Lowe was guilty beyond a reasonable doubt of the knowing, distribution, receipt, and possession of child pornography. I'll begin by noting that we're here on a de novo standard of review. I articulated the standard by which the court evaluates this, but it's a de novo review on this court's part of what transpired below. To begin and to address a relevant issue raised by the court in a prior case argued this morning, the question occurred to me, would this court functionally be making new law or breaking new ground by affirming this conviction or by reversing it? And I would submit to the court that the court would actually be breaking new ground by affirming this conviction. And the reason has to do with the proof and the proof that was submitted below and the inferences that were allowed to be made as a result of that proof. And actually, most of what you're going to hear me talk about is the lack of proof below. Is there a primary flaw in the proof or do you think it is a cumulative failure to present the connecting information? This answer that I'm about to give you makes absolutely no sense, but I would tell you both. The reason why I would say that it's cumulative has to do with, and you'll see in our leading discussion of the U.S. v. Moreland. And Moreland and I think the U.S. v. And even though it's not a Sixth Circuit case, I believe that Sixth Circuit case law is in accord on this point. As Your Honor has suggested, proof in these types of cases is cumulative and it is sort of a totality of the circumstances, and that's maybe a rough term to use, but that's roughly how the court views the proof. But here, in addition to that, and I would say that there wasn't enough cumulative proof, but there also was a fundamental and primary mistake that was made in this case. And it had to do with the government's tying together of the listed times for downloads of the prohibited materials. On the one hand, the comparison of that to other non-criminal use of the computer, like I would call it innocent internet surfing, for example, that was done on the computer, and the comparison of those times. I think that this entire prosecution may have been based on that misapprehension, that there was some relevance there, but there isn't. And the reason why is Special Agent McFaul, there are only four witnesses in this case, they were all government employees, and so you don't have the normal problem that you have with, like, this court disturbing a jury's determination of credibility of witnesses. You don't have that here. Special Agent McFaul testified that the times listed for the downloads of the prohibited materials are when the downloads were completed, if ever. The problem is, and he testified to this as well, the downloads could take hours or days or could never be completed. And so there was absolutely no tie between the non-criminal use, the dates and times of the non-criminal use of the computer to do just innocuous internet searching, on the one hand, versus those dates and times listed for the downloads. How do we know that this is significant and that the government viewed this as significant? Because in two key points during the trial, that was the thing that the government referred back to as being the primary defense to the Rule 29 motion made on Mr. Lowe's behalf. You see that- From the completion of the download, is there some activity that would show on the screen of the computer? No, Your Honor. That was- But that's running in the background just like the program runs in the background if the computer's not turned off. Yes, Your Honor. And in fact, the program is running entirely in the background. And if you don't have that pulled up on the screen, it would- you wouldn't even know it. There's nothing that would tip you off to the fact that that was running in the background. Or had completed a download. Right. Right. One that may have been started hours, days, who knows when, in the past. And- I'm sorry, Your Honor. Oh, I was going to ask you a question when you finish your sentence. You brought up this, assuming it's running at all. And perhaps in the background. I wonder about the screen- the screenshot that we have in the record, Exhibit 9, that shows the desktop, the look of the desktop. Yes, Your Honor. Counsel. You know, so to me, and you'll recall that- and I've showed my colleagues. I'm sure they've seen it too. But that's a pretty bare, in my estimation, my little experience with computers, I'd say that this desktop looks- there are very few icons or programs, right? But that- the program that had the porn is among these eight, six, eight things on the desktop. And the minute you click it, then you see, obviously, you're dealing with porn, you know, the title. So I worry about that. Was that part of the government's case? It was part of the government's case, Your Honor. And the government tried to say that the jury could infer from that, or that the court could infer, or both, that there's no way that that- Knowing aspect. I mean, I should think it goes to knowing. Right. Okay. And I would agree with that. I mean, you know, not conceding necessarily that you would know, but I think that's the right category to put it in. What was the link of the defendant to this regular use of it? Was it- There was none. That was another, you know, huge issue here. But there was something about the business records or communications or something about repairs of- What Mr. Lowe did for a living was never proven at trial, and it's undisputed. You'll see that the judge comments on that as well. You'll see that- Nobody testified that he was in the appliance business or repair business or whatever it was on there. Correct, Your Honor. And there was also no testimony as to what his wife did for a living either. Who was also in appliance sales? I'm sorry? Who was also in appliance sales? Yes, Your Honor. Okay. Although that wasn't in the record either. Nobody testified to that. No, Your Honor. There was no tie- Not only was there no tie to what the defendant did for a living, there was no proof about where he banked. There was no proof about what his hobbies were. There was no proof about how any of the internet surfing, the innocent internet surfing, could have been tied to him. There wasn't proof that this was his- that he used this device or that this was his primary device. In fact, there was a suggestion, and I would have to- I hope you will answer a bit more about the screen. I'm sorry? I know you want to get your- but you'll have extra time. Yes, Your Honor. Moving quickly back to that, keep in mind that we're only talking about a five-and-a-half-month time period, Your Honor. And that's a very short time period, and actually, this is where the two points coincide. There is a suggestion that Mr. Lowe had a primary device that was never found, and it had to do with- Yes, Your Honor. And that that was- because, for example, on August the 8th, 2011, when the search was conducted, Mr. Lowe was not at home, but the computer was. And there's no suggestion that any device fitting the docking station that was described was ever located. And I'm sorry- But there were some searches during that five-month time period. Is that correct? On that computer, there were actual searches for words that are indicative of child pornography. Yes, Your Honor. On the HP Pavilion laptop. Yes, which is- Which I would call the computer at issue. So there was some activity on that computer. Yes, Your Honor. The computer was used within that five-and-a-half-month time period. It's just that there was the limitat- the five-and-a-half-month time limitation had to do with basically the alpha and omega of the prohibited material being on the computer. There was no prohibited material on that computer prior to February of 2011. When a new program was installed? Yes, Your Honor. There were also other computers found. For example, there was a tower computer that was also removed from the home, and it was- I'm not sure this aspect is in response to Judge Strange's. You need to wrap up when you finish with that question. I'm sorry. I may have misapprehended your question, Judge Strange. Just wrap up and finish. You'll be fine. Okay. I've reserved some time, and so- That's okay. Good morning. May it please the Court. My name is Tara Bay, and I work with the U.S. Attorney's Office for the Eastern District of Tennessee in Chattanooga. And the question before us today is not whether there could have been more proof established in this case, but whether the proof that was introduced was sufficient for a rational juror to find each of the elements beyond a reasonable doubt. What was your most egregious proof against this defendant? So the proof that we have is that there were two laptops in the house. There were two adults in the house. One of the laptops had one username. That was Stacy. That was the only username on that one. The other laptop had only one username, and that was Jamie. We don't know that that defendant went by the name of Jamie, do we, or did somebody testify to it? Well, no one testified to that, but it is a derivation of the defendant's name of James, and it is a reasonable one. And there was some letters at sentencing where one of his family members referred to him as Jamie, and the jury did not hear that, but it does show that it is at least reasonable that a person named James went by the name Jamie. Our job is sufficiency of the evidence at presentation. Right, right. So if you could answer that question in light of what was in the record for the jury. So there were the two usernames. All of the child pornography was found under the one laptop, the one username. That would be sufficient in and of itself. If you look at the Shane, I think it's spelled S-C-H-E-N-E, it's the 10th Circuit case that was cited in the OUFNAC case. That was the only evidence that was presented in that case was that there were two individuals, two user accounts, and all of the child pornography was in the user account associated with the defendant's name. The association, we're still holding your feet to the fire with respect to the association with the defendant, and it's based on the name Jamie, the derivation, and an inference that that is he. Right, right. Might I ask before you complete your list, wasn't OUFNAC, didn't OUFNAC have additional evidence? Wasn't there a defendant confession to having child pornography to two people and a password-protected child pornography files on his computer? So that's a different case, isn't it? Yes, it is. It is. And I would agree that a defendant confession is definitely very significant evidence. But OUFNAC did say that where images exist on one person's computer or one person's files, the jury can then infer from that knowing possession. He also said that a sheer number of child pornography images can imply knowing possession. And the titles of child pornography that are very descriptive can also infer the knowing possession. Was there some proof that the defendant had bought that computer or that he said that's his computer or anything except the name Jamie on it? There was no direct proof of that. However, and you asked Mr. Varner this question about the innocent internet surfing that occurred on the computer named Jamie and if there was any connection to the defendant. And there was. Because several of those internet sites, the innocent ones, had login name of jamedog, J-A-M-E-D-O-G, or an email address of jamedog111 at excite.com. And there was a paper that was on the desk in the office when they did the execution of the search warrant. And the paper had the defendant's name, his date of birth, his address, his social security number, and it also had an email address that was jamedog111 at excite.com. So I believe that that is a link between the defendant, James Lowe, and that email address, which was used in the innocent internet surfing. I'm sorry, I don't have an exhibit number on that. That was an exhibit. That was a trial exhibit. The piece of paper? Yeah. Let me, I have it referenced. You can supplement with that. I just would like you to let us know. It's on page 75 and 76 of document 75. That was the first day of the trial transcript, page 75 and 76. Also, on the last page of the government's exhibit 19, the one of the last things that shows on there is an Amazon. Someone went to the amazon.com, and the login username there was James Lowe. And then eight minutes later, there's a preview of a child pornography video labeled PTHC Marion 11YO. Tell us what you mean by a preview. Was it something that automatically came up on the screen? No. Was it a completion of a download or a partial download? Well, it would have been a completed download. And if I could. That's what I'm struggling with. If this program is running in the background, and I can't see it on my screen, and it's running and it's downloading, and you're saying, well, when the download was completed, you were on the computer. But if there's nothing that comes up on the screen that says download completed, mini picture, whatever it is to let me know, what is it that connects the completion of a download after some inestimable time to my activity on the computer at that very moment? Well, if I can just explain a little bit about how Shareeza works, the peer-to-peer. So how that works, the software that I install onto my computer, Mr. Varner installs onto his computer. Part of the installation process is I decide if I want to share any of the files on my computer. And when I mean files, I mean documents, pictures, video, or audio. And I put those in a shared file folder. Mr. Varner does the same on his computer. He puts images or videos or whatever files in a shared file folder. Then I do a search of whatever, 57 Mustang, Allman Family Reunion, PTHC, Lolita, Jailbait, whatever that is. And the software will then look at all the people who have the Shareeza software. And in their shared file folders, if they have a file that has those same search terms, then it will give me the opportunity of if I want to download any of those files onto my computer. And I think Judge Cooke, you were talking about this earlier. Somebody does need to be typing those search terms in. They need to be at that laptop typing or using their mouse actively at that laptop to get those. And then you get a list of all the files currently that have those search terms. And then you click on the ones that you want to download. And then they begin downloading. And while they're downloading, you can preview and watch that part right there. But your time evidentiary at the trial was not to that point in time. It was to the point of the completion of the download. Am I correct? Well, I don't believe that the time on Governments 19 signals the completion of the download because there are a number, quite a few numbers, of partial downloads. And what that indicates is that for me to be able to download a file from Mr. Warner's shared folder, his computer has to be on. He has to be, Shariza has to be up and running. My computer has to be on. And my Shariza has to be up and running for that to happen. If while I'm downloading a video from his computer, he turns his computer off, then it stops. And what you have is a partial. If I turn my computer off, it stops. And then I have a partial. So what we have here in the Governments 19, there's quite a few that have partial at the end of the label. And so what that indicates is that those videos were not completed, that the download was not completed on those videos. From that, you sought to have the jury infer that that was done by Mr. Lowe while he's at his computer. Yes. And that's an inference, is it not? Yes, it is. So it's at least two inferences have to be drawn at that point, stacked. We'll call it stacked because we have to give you your worst scenario while you're standing here. But we have to stack the inference that it's Jamie equals James and this James. And then this is that he was there and he put the terms in, right? These are all, in the end, we're going to say, are those all reasonably drawn, those inferences? So those are two. The other circumstantial evidence is the sheer volume. There were almost 1,500 files that were downloaded during this 5 and 1⁄2 month period. There were downloads that were occurring two or three days a week consistently through this. I think we're told, though, that that's just the nature of the beast, that you sign up for this, whomever signs up for Charisa. And then it's constantly working in the background, downloading a gazillion files. But you ask it to download. You have to put in the terms, and it'll just keep looking forever and ever. Actually, you put in the terms. What do we draw from the volume? I know some cases take volume as an important feature. What do you ask us to draw from the volume? What I would say from the volume and the frequency and the times when these were occurring, 1 AM, 9 AM, noon, 2 PM, 6 PM, 9 PM, is that it had to have been someone who was in the house every day, throughout the day, who could be putting these search terms in, selecting videos and files for download. In this household, we're told there were three people. The jury was told there were three people at various times. That's correct. And so what evidence was presented to the jury with respect to who's home when, what they do, you know, is there evidence of any of that? For the adopted son, he was under the age of 18, and he was going to school. And he was, there were... That they know his attendance records? I mean, Judge is saying, we know teenagers don't go to school. Right. We introduced his attendance records during that time period. And it shows that... Always at school, kind of high. On four different days where there were downloads occurring at home during the day, the defendant, or the son, was in attendance at school. And then the fifth day... Were there downloads occurring when the child was at school, or were there fed-in search terms while the guy was at school? I mean, isn't that the distinction? If he, let's say this young man sat down when it was first created and put in 50 search terms, left it running on the computer behind everything, it'll just keep on searching, right? There's a... And it will hit the spot. He's at school, it downloads. I mean... There's another step there. Okay. Okay. So, I put the search terms in. And it goes out and it finds out all of the files that have those search terms in it. And it gives me a list. It doesn't download anything. It gives me a list. And then I click on the ones that I want to download. And then the download begins. So, it's not just constantly downloading things onto my computer without my knowledge. It's I put the search terms in, it gives me a list. Once a week, you could go in and check the list, say what you want, and leave it running behind to download. Well, as it gets to them. The search runs so long as the computer is on and it is attached to the Shariza connection. There's a connection there. And so, you could go through and select... You go through and select the ones that are downloaded. You turn the computer off or the internet connection is disconnected. Then you have to go back and put the search terms in again. At most residences, the internet connection is not turned off when you leave the home, right? I mean, there's not a lot of turning off that goes on in anywhere. Well, I don't know about most. In mine, it does. But what I would say in this case is that we do know that at the time of the search warrant, I'm on the power saving mode. So, it goes off if I leave it alone. Internet goes off. Yeah, it does. It disconnects from the internet. But what we do know in this case, the evidence in this case was that when they executed the search warrant, the computer that had all the child pornography was off. It was not connected to the internet. It was off and it was on the ground between the desk and the sofa. At that same time, when there was one person in the house, Stacey Lowe, the defendant's wife, there was a laptop on while she was there. It was up and running. It was open on their bed. And that has a username, Stacey. So, it's a safe, reasonable inference that she was using that laptop in her name while she was there, it was up and running. And so, that it is unreasonable to assume that she would be constantly using the other laptop throughout the day, in the middle of the night. Wouldn't be your first inclination to think that she was. And since your time is up, we'll leave it there for now. Thank you. Lots to talk about. To begin, let's talk about the three steps of the downloads that you were just told about. Number one is the entry and use of the search terms. Number two is the initiation of the download by what opposing counsel referred to as the selection of search results. And number three, the completion of the download. Let me be very clear about what special agents McFall testified to. He testified that there is no way to know when the search terms were entered. That's number one. And he testified that there is no way to know when the download was initiated. The only thing that you know is when the download was completed. And so, what the government told you just a few moments ago, essentially, was this, again, comparison of download times to computer usage times. And the significance of that is especially glaring given the government's refusal to respond to the direct question asked by Judge Stranch of, there's no notifier that you get when the download is completed. Judge Stranch asked that point blank question and never got a yes or no. The answer is no. You don't get any. A lot of us were asking questions. Well, no, but I'm just saying that that was a particularly important one. And as far as understanding the process here, and there is no notifier that you get. And while I would never pretend to be a computer expert myself, I can at least go this far and say there was certainly no testimony about that during the trial. And I don't believe that there's any notifier that you actually get, in fact, either. And so this does run in the background. You don't know it's there. And as you noted, Judge Cook, the Wi-Fi, what the proof was is that this was on a Wi-Fi system at the house. And so the Wi-Fi is a 24-7 proposition. And so- But if your computer is actually turned off, a laptop is turned off, it will, actually, when you turn it back on, it starts up again without triggering it, doesn't it? That's exactly right. And not only that, it starts up without you knowing it in the background. And Special Agent McFaul testified to that as well. So in terms of being able to marry these times, you just can't do it. And, you know, that's the problem that the government has had with this. And I've even wondered whether or not the entire prosecution, the initiation of it, was based on that misapprehension, that there was some significance there. And how does the court know that that's particularly significant? Well, presumably, that's why Special Agent McFaul said, I don't know who owned the laptop at issue, and I don't know who did these downloads. And he was never asked to offer an opinion on it either. As was the expert in USV Mellie's, as was the expert in USV Moreland. In Moreland, like here, the expert couldn't say. In Mellie's- You're saying that these times that the prosecution was saying that the computer was being used like one in the morning and nine at night has no significance in the case. That's just when it was downloaded? Yes, Your Honor. You can't tell. You can't tell if it has any significance or not. And the fact that a download was completed at that particular moment in time doesn't even necessarily mean that the computer was being used at that point in time. And thank you, Judge Schuyler, because that brings us back to another point. No one had to be home. No one had to be home at all. That's one of the biggest red herrings about all of this, is that the government- Did McFaul, Special Agent McFaul, testify to the inception of a new download? And I'm looking to the feature of when the computer is reignited, you know, that it has been completely turned off, and then it's turned back on. So I take it that the timing of that is knowable? Or maybe it wasn't part of the trial and that's the most important question. It wasn't. I believe, and I don't want to mischaracterize this for the court, and so I'm going to caveat it with I'm not positive. And I realize, as an officer of the court, you're going to tell us what you know, because counsel can't speak again, but she did give us times, and you must know from the trial when, 1 a.m., 9 a.m. I believe those were the completions. Okay. I believe that those were the completions. When it comes to the, now, it would be, it's two different questions, one for the prohibited material, and one for the innocent internet surfing. The innocent internet surfing may be indicative. Tell both times. Right, right. That's exactly where I was going on. Your response to her docket reference to a piece of paper on Mr. Lowe's desk that had the name that was used, that had some sort of relational use, either to the computer or to, I guess not to the child porn, but just to the use of the computer. Was there a piece of paper? How does that play into identifying the computer? Worst case scenario for Mr. Lowe, I'll start there and then work my way back. Worst case scenario for Mr. Lowe is that it shows that he used the computer maybe a few times. It certainly does not give any indication, well, maybe. You don't even necessarily know that. And I'm talking about in the technical abstract. Because when it comes to email, email is generally something that's password protected. And there's no evidence, you can't tell, for example, from Exhibit 19, whether or not a password was used to access an email account. Just simply that the site hosting the mail, I believe, was visited. I believe I'm getting this right. Sometimes the technical aspects. The record reflects that there was no password protection on Wi-Fi, there was no password protection. There was password protection on Wi-Fi, but it was typed into the computer. So it automatically. Right, so that you didn't have to do anything on the computer to access it. Nor any of the icons on Judge Cook's example for a password protection, including the child porn site. That's correct. And also with just the computer generally itself, sometimes, like for example, my office computer, the first thing that I do when I log in, I get asked for a password before I can do anything else. And then you get in. And there was no password of that kind either. Judge Cook, oh, I apologize. If I may, I was just gonna answer the question, Judge Cook, or finish answering the question that you'd asked previously about the icons on the desktop. With regard to the number of icons and the accessing of them, keep in mind that the objectionable material was only there for five and a half months. So in terms of the life of the laptop and the use of it, I don't think that there's any significance to the fact that someone might not have accessed a particular icon in five and a half months. Now, over the life of the computer, that might be a different question, but we have a finite five and a half month window, approximately, that we're talking about with regard to the objectionable material. And nothing prior to that was ever found. And Mr. Lowe has never had any. I have your answer.  Sorry, thank you, Your Honor. Thank you. Thanks very much. Before you actually go away, Mr. Varner, the court wishes to thank you. I see that you've taken this case under the Criminal Justice Act. Am I correct? We rarely do this, but I speak just for myself that your work was exceptionally good. That's not to say anything about the value of what the court will do with the disposition of this case, but you did an extraordinarily good job for your client. I speak for myself. For all of us. We all agree. Anyway, thank you for your help. Thank you. All right, you have been of service to the court. So, absolutely, both of you, because it's tough work that you both do. So thank you very much. And with that, will you adjourn court?